IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 1, 2024

FILED
JUL 22 2024
Clerk of the Appellate Courts
REc'd By_____

**IN RE SILVIA F.[1]**

**Appeal from the Chancery Court for Cumberland County**
**No. 2021-CH-2050  Ronald Thurman, Chancellor**

_____

**No. E2023-00704-COA-R3-PT**

_____

Mother appeals the termination of her parental rights. The trial court found three grounds for termination: abandonment by failure to visit, abandonment by failure to support, and failure to manifest an ability and willingness to assume custody. The trial court also concluded that terminating Mother's parental rights was in the child's best interest. We conclude that the trial court did not err in concluding either that a ground for termination was established or that termination is in the child's best interest.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KENNY W. ARMSTRONG, JJ., joined.

Jonathan R. Hamby, Crossville, Tennessee, for the appellant, Amber S.

Ivy G. Mayberry, Crossville, Tennessee, for the appellees, Nathaniel F. and Tara F.

Matthew J. McClanahan, Crossville, Tennessee, Guardian ad Litem for the minor child, Silvia F.

**OPINION**

This case concerns Silvia F., a minor child who was four years old at the time of the final hearing in this case. Appellees Nathaniel F. (Father) and Tara F. (Stepmother) filed a joint termination of parental rights and stepparent adoption petition in the Chancery Court of Cumberland County on July 2, 2021. Amber S. (Mother) opposed the petition at the

_____

[1] It is the policy of this Court to protect the privacy of children in parental termination cases by avoiding the use of full names.

March 29, 2023 final hearing. On May 2, 2023, the trial court granted the appellees' petition, finding three statutory grounds for termination and that terminating Mother's parental rights was in Silvia's best interest. Mother appeals this decision.

For many years Mother struggled with an opioid addiction. At times, Mother's drug use drove a wedge between her and her family, which sometimes left her on her own without family support. Mother met Father and became pregnant with Silvia. Father testified that he was generally aware of Mother's drug use prior to Mother's pregnancy. Two hair follicle drug screens—one taken shortly before and one taken shortly after Silvia was born on February 8, 2019—indicate that Mother continued to abuse opioids while pregnant with Silvia.[2]

For approximately a year, Mother lived with Father and his family. Though disagreement exists about the quality of parenting by Mother during this time, the parties agree that Mother provided some care for Silvia and attended doctor's appointments with Father. Mother's drug use, however, persisted, and it appears that her opioid abuse drove a wedge between Mother and Father and between Mother and Father's family.[3] An incident occurred in 2019 wherein law enforcement was called to break up a "fight." This incident caught the attention of the Tennessee Department of Children's Services (DCS). DCS requested that Mother complete an intensive outpatient drug treatment program. Though it is unclear exactly when Mother completed her treatment and which provider Mother relied upon at that time, she completed a program. Following Mother's completion of the program, DCS's assistance and involvement in this case evaporated.

Unfortunately, the intensive outpatient treatment program did not result in Mother ceasing her opioid abuse. Her addiction continued to generate friction. Father testified that he issued an ultimatum to Mother in February 2020: enter drug rehabilitation or leave his family's home. According to Father, Mother chose the latter option, refusing to re-enter drug rehabilitation. Mother insists that Father unilaterally kicked her out of his family home. Father testified that Mother's drug abuse was negatively impacting her parenting of Silvia. Though disagreement exists regarding the extent of negative impact, Mother concedes this point. When Mother left, Silvia remained in Father's care, and the parties do not dispute that Mother's last in-person interaction with Silvia occurred on or about March 21, 2020.

Father began seeing Stepmother, and the two married in September 2020. Since

---

[2] The record does not contain any proof that the hospital staff tested Silvia for drug exposure following her birth. Mother testified that she was not positive for drugs at the time of Silvia's birth. Medical records from Silvia's birth, however, indicate that the umbilical cord was tested and was positive for oxycodone on the date of Silvia's birth.

[3] Mother testified that Father used marijuana during this time as well, and Father concedes that he did use marijuana, testifying that he stopped using drugs during the first year of Silvia's life.

then, Father has lived with Stepmother, Stepmother's son, and Silvia in Clarkrange, Tennessee. Father testified that he attended online cyber security courses through a program administered by Southern New Hampshire University while working as a DoorDash delivery driver to provide income for Silvia's upbringing. Stepmother also generates income for the family through her work in the medical field, working as both a medical assistant and a social worker.

Both Father and Stepmother testified about the positive and loving nature of their home. Father testified that Silvia has a "good relationship" with Stepmother and Stepbrother. He explained that Stepmother "reads her bedtime stories . . . helps her brush her teeth, [and] cooks her dinner." He stated that they all often play at the Clarkrange Park together when he is not studying. Father testified that Silvia plays with a variety of toys, and that, during those times, he watches Silvia play with her toys at home. Stepmother testified as to the close relationship Father has with Silvia. Describing Silvia's relationship with Father, Stepmother testified that "nothing's perfect, but as close to perfect as you could get. She's lucky. Not every little girl has the daddy figure in her life. There's nothing in the world to her like her daddy." Stepmother elaborated that, "Anything Daddy is doing, [Silvia] wants to do. She was underneath the car yesterday with her little gloves on trying to figure out how to help him change the oil on the car. . . Whenever he's mowing the grass, she's on the ride-on mower with him. . . . . She looks up to him. It's about as perfect as it can be."

Father moved for an ex parte restraining order and emergency custody order on July 16, 2020. Father noted in the motion that Mother had "no permanent residence, no vehicle, no employment, and no way to provide for the day-to-day needs of the minor child." Mother admitted that, at various points, she was essentially homeless, moving between multiple different homes of friends and acquaintances. Father also stated in his motion that Mother had "pending criminal charges as a result of her drug usage." The record contains no documentation regarding the nature of those criminal charges, but Mother described them as "paraphernalia" related charges stemming from her usage of illegal drugs. Mother testified that she was eventually imprisoned on these charges, but the record fails to indicate exactly when her term of incarceration began and ended. However, Mother stated that she was released on probation sometime before October 2020.

The Juvenile Court for Cumberland County granted Father's request for an ex parte temporary restraining order on July 16, 2020, but left the question of whether Father should have exclusive custody of Silvia for a later hearing scheduled for August 5, 2020. Both parties agree that Mother received this temporary restraining order and that the order did not indicate that Mother had been afforded any type of visitation with Silvia. Mother did not appear at the August 5, 2020, hearing. Thereafter, the Juvenile Court entered an order on August 18, 2020, that noted Mother "was with proper notice and failed to appear." The Juvenile Court's August 18, 2020 order, unlike the July 16 ex parte temporary restraining order, does include language that allows for "contact between [Mother] and the minor

child" so long as that contact is "directly supervised by the [Father] or their designated representative." Mother maintains she never received a copy of the Juvenile Court's August 18, 2020 order, which she attributes to her imprisonment. Mother did agree that she not petition or seek visitation through the courts prior to filing of the termination petition.

By no later than the beginning of October 2020, Mother was no longer incarcerated. On October 2, 2020, Mother sent a message to Father indicating that she would "sign my rights away sobyou [sic] can do what ya please" with Silvia. The parties agree that Mother did not ultimately relinquish her rights. Facebook messages that appear to have been sent later that month include the following exchange:

Mother: I'm clear headed I'll keep on you know I will…

Father: I told you to contact me on Saturday. And I'll give you a time and place. Visitation wont happen at my moms or your moms. It will be in a public setting with just you.

Mother: Okay all that's cool. Can you ride up to the [expletive] dollar store so I can her for 5 mins. Or I can pack up at Clara's and you bring her up there for 5 minutes pleeeeease

Mother: Pleaseeeeeee itd really help me rn. Cause right now I feel like I'm trying to get all this going for nothing and that, I have no one. And I've had like 3 mental breakdowns lol.

(Ellipses in original).

Although the following messages are undated, context suggests that they reflect the continuation of the above-quoted conversation:

Mother: If your mom says it's okay. I'll come there I won't start [expletive] or say [expletive]. I may cry cause silv but it's good tears promise.

Father: I told you, contact me Saturday.

Mother: Nathan please you realize how long it's been.. please 5 mins.. If you ain't there.. fine that's cool… I ain't worried about all that.. I just wanna see her..

Father: I told you, contact me Saturday.

Mother: Whyyyyyyy

- 4 -

Mother: Come onnnnn... you know yaw anna see my crazy [expletive] too [two laughing crying emojis]

Mother: I'll pull up and talk to tara the[n] what can ya do lol.

(Ellipses in original). Contrary to Father's guidance about where they would meet, Mother showed up in person at his family residence screaming and banging on windows, which resulted in law enforcement being called. Mother was "banned from [Father's] mother[']s house for trespassing" on October 14, 2020.

It appears that the parties agreed to meet on October 23, 2020, at Clarkrange Park. This meeting was arranged with the following Facebook messenger exchange:

Mother: Park?

Father: Park?

Mother: Yeah the park...? Figured you could bring silvia to.

Father: She don't need to be there for the first conversation. You aint seen her in 8 months. And I'm not gonna just throw that on her.

Mother: How else that gonna happen? Can you meet today?

Father: Yeah I can. And because we need to have a civil conversation before that happens.

Mother: What else do you have to do. You guys live in whatever state are here doing nothing. Come on 5 minutes won't kiiiiiill you.

Father contends that Mother's behavior rendered the initial Clarkrange Park meeting unproductive. He explained that Mother's conduct during the October 23 meeting, during which she seemed to be on drugs, raised serious concerns in his mind about the safety of visitation for Silvia. Father introduced another series of messages he received from Mother that appear to have been sent after the October 23 meeting, and Father insists those messages heightened his concern about Mother's well-being. In these messages, Mother threatened to "start sending nudes" to Father if he did not let Mother see Silvia, which Father described as an effort to create marital friction between him and Stepmother.[4]

---

[4] Copies of the text messages admitted into evidence appear to include videos Mother sent shortly after making these threats, but these videos are not independently included in the technical record.

- 5 -

Mother also questioned in these messages whether Father would "wanna be RESPONSIBLE" for her "Relapse." According to Father's contact timeline and Stepmother's testimony, Mother next attempted to inquire about visitation with Silvia on or about December 22, 2020. On that same day, Father sent Mother the following message: "In the best interest of Silvia, till you are clean and can prove it to the courts, No visitation will happen. Or pictures." Mother concedes that Father was "for the most part" fair with her in terms of his handling of any inquiries related to visitation. She also concedes that at the time she was still "heavily" using drugs and that when using drugs she posed a danger to Silvia. Additionally, Mother concedes that Father waited for more than a year after her departure from Father's family home for Mother to clean up her drug abuse, which she failed to do, before filing the petition to terminate her parental rights.

Mother testified that she was hospitalized as a result of a "psychotic episode," at one point during or around October 2020 and experienced another mental health-related event in 2021 that she characterized as consistent with a "mental health breakdown." In 2020, Mother was hospitalized for approximately one week in Murfreesboro, Tennessee. When asked about specific actions or injuries Mother might have suffered that would have led to her hospitalization, Mother denied having engaged in self-harm. The testimony in the record related to these mental health-related matters was extremely thin. The only information shedding light on exactly what transpired in connection with Mother's 2020 hospitalization is Mother's statement that her hospital visit arose out of "suicidal ideation" stemming from a poor interaction she had with her own mother. At various points in the trial, Mother was described as having previously suffered from depression, but no documentation or testimony exists in the record showing Mother was ever diagnosed with depression and no documents were admitted into evidence from the health care facility describing the nature and circumstances of her hospitalization. Mother did note that she had previously been prescribed Zoloft in high school, but also that she stopped taking Zoloft at some unknown point in the past based on her belief that the medication was no longer necessary. Mother also testified that the doctors did not prescribe her any medication as a result of her hospitalization. Mother and Mother's family members testified that Mother was doing significantly better after having gotten off drugs, and that she was not continuing to struggle with mental-health-related issues.

The parties disagree about Mother's attempts to interact with Silvia in 2021. According to Father, Mother did not inquire about Silvia in January, March, May, June, July, August, September, or October of 2021. Mother did, however, reach out to Stepmother on February 8 in response to Father's blocking her on Facebook. Stepmother conceded that Father did, in fact, block Mother on social media, reasoning that the blocking was appropriate so long as Mother had one line of communication—text message— available for her to contact Father.

Mother provided text messages indicating that she attempted to contact Father on April 30, May 1, May 12, July 7, July 9, November 21, and November 22 of 2021. None

of the messages, however, include a request to see Silvia. The following text message stream contains every communication between Mother and Father sent between April and November of 2021:

Mother on April 30, 2021, at 1:45pm: Hey

Mother on April 30, 2021, at 4:36pm: What's silvia doing

Mother on May 1, 2021, at 7:49am: Hey

Mother on May 12, 2021, at 3:15pm: Hey

Mother on July 7, 2021, at 8:21am: hey is everything okay?

Mother on July 9, 2021, at 8:48pm: hey is silvia okay?

Mother on November 21, 2021, at 7:01pm: Hey

Mother on November 22, 2021, at 5:17pm: Hey its amber

Father on November 22, 2021, at 7:17pm: If you have questions, contact our attorney Ivy Gardner at 931-484-2889 or the guardian of litem Mathew McClanahan at 931-548-7702.

Additionally, Mother testified that she was in jail for a brief period in March 2021 for violating the terms of her probation. The record does not include details of exactly how Mother violated her probation, when that violation occurred, or the exact dates during which Mother was in jail. Mother testified that she was in jail for "[l]ike, four days or, like, a weekend . . . . [at least] a couple days in March [2021]."

On July 2, 2021, Father and Stepmother filed their joint petition to terminate Mother's parental rights to Silvia and to have Stepmother adopt Silvia. They raised three grounds for termination in their petition: abandonment by failure to support, abandonment by failure to visit, and failure to manifest an ability and willingness to assume custody. Concerning the failure to support ground, Father and Stepmother alleged that they had not received any financial support from Mother whatsoever. Father and Stepmother also alleged that terminating Mother's parental rights to Silvia was in Silvia's best interest. Mother filed an answer to the appellees' termination petition on December 9, 2021, contesting their arguments but without raising any willfulness affirmative defenses.

Mother concedes that at the time the petition was filed that she was not working because she was abusing drugs and that she was using "[a]nything I could get my hands on." Mother also concedes that at the time the petition was filed that she posed a danger

to Silvia. Regarding her knowledge about Silvia, Mother indicated that she did not know whether Silvia had physical or mental challenges and was not aware of her favorite food, color, toy, or whether she was in daycare or school. Mother conceded that she was, essentially, a stranger to Silvia.

Mother, however, presented significant evidence that her general life circumstances had dramatically improved between the time that the termination petition was filed in this case and the date of the final hearing. Mother, Mother's sister, and Mother's father collectively testified to the following: (1) Mother has become drug-free, as both Mother's sister and Mother's father asserted that October 31, 2023, would mark being "clean two years"; (2) Mother has permanent housing with Mother's sister within a multi-bedroom house, living alongside Mother's sister's twenty-year-old child; (3) Mother has obtained independent transportation, as well as accompanying car insurance; (4) Mother started working at Cumberland Containers in November 2021 and has maintained that job ever since, earning $14 per hour in regular wages; (5) Mother has obtained medical services and opioid therapy treatment through "Spero," including a prescription for suboxone that has been used to counteract her urges to relapse into renewed opioid abuse; (6) Mother completed all of her probation requirements on February 8, 2023, and had no pending criminal charges as of the date of the final hearing. Regarding her interactions with Spero, Mother testified that she has continually been engaged with a counselor who has helped her not only with her drug addiction generally but also with regard to the unspecified condition that led to Mother's hospitalization in October 2020.

Mother's sister denied ever seeing the August 2020 preliminary order entered by the Juvenile Court providing Mother with supervised visitation with Silvia and asserted that Father and Stepmother have all but ensured that no visitation can take place. The technical record includes a motion to set visitation filed by Mother in the Chancery Court on December 21, 2021, reflecting Mother's view that Father and Stepmother "are impeding any and all contact between the minor child and the Mother." The trial court ordered all parties to complete a drug screen in response to this motion, and Mother passed that drug test on April 18, 2022. Thereafter, Mother amended her motion to set visitation on June 28, 2022, emphasizing that her completion and passage of the drug screen demonstrates that "it would be in the best interest of the minor child for this Court to set a temporary visitation schedule pending a Final Hearing in this matter." It does not appear that the Chancery Court acted on Mother's motion.

The Chancery Court held a final hearing on Father and Stepmother's termination petition on March 29, 2023. At the outset of that hearing, Mother articulated via counsel her belief

> that there was a pattern of the child being kept away from the mother while she was voluntarily trying to exercise parenting time. I think those are the facts that will come out today, that there was not a willfulness on the

abandonment issue.

At the final hearing, Mother acknowledged that she was not in a good position to have custody of Silvia at the time that the termination petition was filed, primarily due to her homelessness, opioid addiction, and lack of stable employment. Mother conceded that she would have been harmful to Silvia at the time. Mother also testified that she understood that she had a legal obligation to support Silvia financially through child support, that she had the ability to work, but that she chose not to work. When asked why she did not work prior to the filing of the petition, Mother responded, "[J]ust I was, I mean, on drugs. . . . Anything I could get my hands on." Father and Stepmother also presented drug screen results showing that Mother tested positive for methamphetamine and amphetamines in February 2022. This positive result for methamphetamine and amphetamines was within the two-year period that Mother and Mother's sister and father testified that Mother had been clean. Mother explained that her drug levels were low and that the positive test was connected to the residual markers of earlier drug use that endured in connection with drug hair follicle testing.

Responding to Mother's allegations that Father and Stepmother prevented her from seeing Silvia, counsel for Father and Stepmother engaged in the following colloquy with Mother:

> [Counsel:] So [your text messages with Father] would reflect [Father] actually telling you, I want to have a civil conversation about this whole ordeal, but I'm not bringing our small child to the first meeting?
>
> [Mother:] (Nods head.)
>
> [Counsel:] Correct?
>
> [Mother:] Yeah.
>
> [Counsel:] He didn't boldface just say, No, you can't see her; correct?
>
> [Mother:] Correct.
>
> [Counsel:] He said, I want to have a discussion first?
>
> [Mother:] Yes.
>
> [Counsel:] Is that fair?
>
> [Mother:] Yes.

[Counsel:]  And that's really how he's always been; correct?

[Mother:]  Yeah.

[Counsel:]  [Father's] always been fair to you, hasn't he?

[Mother:]  I mean, for the most part, yeah.  But when that day came, he had [Stepmother] with . . . him, and I didn't know her, and I just wanted to talk to him that day, you know.

[Counsel:]  So he did meet you?

[Mother:]  Yeah.

. . .

[Counsel:]  So in December of 2020, [Father] explained to you that you need to get clean in order to see Silvia?

[Mother:]  Yes.

. . .

[Counsel:]  Okay. He didn't deny you seeing her, he just said you need to clean up first?

[Mother:]  Yes.

. . . .

[Counsel:]  So you would agree that [Father] told you [in October 2020,] Contact me Saturday, I'll give you a time and place, but visitation's not going to occur at my mom's or your mom's?

[Mother:]  Yes.

[Counsel:]  But I'll let you do it in a public place; correct?

[Mother:]  Correct.

[Counsel:]  So, again, he's not telling you no; right?

[Mother:]  Right.

[Counsel:] You just weren't happy that it wasn't going to be at the place you chose?

[Mother:] Right.

[Counsel:] Fair?

[Mother:] Yeah.

[Counsel:] So [Father's] never told you no, has he?

[Mother:] No.

[Counsel:] He's always given you options. You've just not chosen them?

[Mother:] (Nods head.)

[Counsel:] Correct?

[Mother:] Correct.

In his remarks to the court, the Guardian ad Litem acknowledged that Mother had made considerable progress since the time that the termination petition was filed in this case. However, he opined, "There's a little too much water over the dam at this point, perhaps, with the current circumstances."

The Chancery Court entered a final order terminating Mother's parental rights. The court found that Father and Stepmother proved all three grounds alleged in their petition by clear and convincing evidence. The trial court's order indicated that the relevant four-month period for calculating Mother's alleged abandonment encompassed the four months immediately preceding the filing of the termination petition. The trial court concluded that Father and Stepmother proved by clear and convincing evidence that Mother had willfully failed to visit Silvia and willfully failed to provide support. Although the trial court did not make an explicit adverse credibility finding against Mother, it did include a list of items that it found to be "credible proof," and that list mainly consists of Father's and Stepmother's testimony. Regarding failure to manifest an ability and willingness to assume custody, the trial court found that Mother lacked an ability and willingness to assume custody. Notably, the trial court did not make a finding that reuniting Silvia with Mother at this stage posed a risk of substantial harm to Silvia's physical or psychological wellbeing. After considering and assessing the statutory termination factors, the trial court also concluded that there was clear and convincing evidence that terminating Mother's parental rights was in Silvia's best interest.

Mother appeals the Chancery Court's order terminating her parental rights to Silvia. Mother raises the following three issues: (1) whether the trial court erred in finding that the Mother had abandoned the minor child, (2) whether the trial court erred in finding that the Mother had failed to manifest an ability or willingness to personally assume legal and physical custody of financial responsibility of the minor child, and (3) whether the trial court erred in finding that the termination of the mother's parental rights is in the best interest of the minor child.

## II.

Parents have a fundamental constitutional interest in the care and custody of their own children. *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). This fundamental interest is "far more precious than any property right." *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982)). "[P]ublic policy strongly favors allowing parents to raise their biological or legal children as they see fit, free from unwarranted governmental interference." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). However, a parent's rights are not absolute and may be terminated on clear and convincing evidence that statutory grounds for termination exist and that termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(1)-(2); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013).

In a termination of parental rights case, we review a trial court's findings of fact de novo on the record with a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. R. App. P. 13(d). "In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). The grounds for termination and the determination that termination is in the child's best interest must be established by clear and convincing evidence, that is, evidence that "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts" and that "eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596; *see* Tenn. Code Ann. § 36-1-113(c). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## III.

The trial court found that Father and Stepmother established three statutory grounds for termination by clear and convincing evidence. In her briefing on appeal, Mother argues the grounds of abandonment by failure to visit and failure to manifest an ability and

willingness to assume custody were not proven by clear and convincing evidence. Mother's arguments on appeal do not address the ground of abandonment by failure to support. Nevertheless, "in parental termination cases in Tennessee 'waiver does not apply in the context of either the grounds for termination or whether termination is in a child's best interest.'" *In re Preston H.*, No. M2022-00786-COA-R3-PT, 2023 WL 6793215, at *16 (Tenn. Ct. App. Oct. 13, 2023), *perm. app. denied* (Tenn. Jan. 24, 2024) (quoting *In re Aniyah W.*, No. W2021-01369-COA-R3-PT, 2023 WL 2294084, at *6 (Tenn. Ct. App. Mar. 1, 2023)). Accordingly, we also consider the ground of abandonment by failure to support in addition to the challenged grounds.

## A. Abandonment by Failure to Visit

The trial court found that Father and Stepmother presented clear and convincing evidence that Mother abandoned Silvia by failing to visit her. *See* Tenn. Code Ann. § 36-1-113(g)(1) (effective July 1, 2021, to Jun. 30, 2022).[5] Abandonment occurs when a parent fails to visit his or her child "[f]or a period of four (4) consecutive months immediately preceding" the filing of the termination petition.[6] Tenn. Code Ann. § 36-1-102(1)(A)(i) (effective July 1, 2021, to May 8, 2022). Here, it is undisputed that Mother did not visit Silvia even once during the four-month period immediately preceding the filing of the termination petition, meaning Mother's conduct fits the statutory definition of abandonment. *See id.*

In response to a termination petition alleging abandonment, a parent may assert a lack of willfulness as an affirmative defense. Tenn. Code Ann. § 36-1-102(1)(I). A parent who alleges that their abandonment was not willful "bear[s] the burden of proof that the failure to . . . support was not willful. Such defense must be established by a preponderance of evidence." *Id.* As "the absence of willfulness is an affirmative defense pursuant to Rule

---

[5] *See In re J.S.*, No. M2022-00142-COA-R3-PT, 2023 WL 139424, at *6 (Tenn. Ct. App. Jan. 10, 2023), *perm. app. denied* (Tenn. Apr. 4, 2023) ("This court applies the versions of the parental termination statutes in effect on the date the petition was filed.").

[6] Mother's brief imprisonment during March 2021 does not affect the calculation period for analyzing either abandonment ground relevant to this appeal. While it is true that Tennessee's termination of parental rights statute defines abandonment differently when a parent has been incarcerated during the four months immediately preceding the filing of a termination petition, *compare* Tenn. Code Ann. § 36-1-102(1)(A)(i) *with* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (indicating the relevant four-month calculation period changes when "a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action"), the statute also instructs courts to treat any "period of incarceration lasting less than (7) consecutive days" as "days of nonincarceration." Tenn. Code Ann. § 36-1-102(1)(J). Here, although the exact dates of imprisonment are unclear, Mother's testimony that she was imprisoned for "[l]ike, four days or, like, a weekend . . . . [at least] a couple days in March [2021]" renders the March 2021 incarceration period brief enough in duration to fall within the general statutory provision. *See id.*

- 13 -

8.03 of the Tennessee Rules of Civil Procedure," a parent asserting such a defense must ordinarily plead it sufficiently in an answer to avoid waiver. *Id.*; *see also In re Glenn B.*, No. M2023-00096-COA-R3-PT, 2023 WL 8369209, at *10 & n.9 (Tenn. Ct. App. Dec. 4, 2023) (deeming willfulness waived in the abandonment context where "Mother did not plead the absence of willfulness").

An affirmative defense such as a lack of willful abandonment may nonetheless be addressed under Tennessee Rule of Civil Procedure 15.02 if the parties try the affirmative defense by express or implied consent. *In re Chance B.*, No. M2023-00279-COA-R3-PT, 2024 WL 764015, at *8 (Tenn. Ct. App. Feb. 26, 2024), *perm. app. denied* (Tenn. May 23, 2024). "Implied consent hinges on the issues that were actually litigated by the parties." *McLemore v. Powell*, 968 S.W.2d 799, 803 (Tenn. Ct. App. 1997); *see also In re Glenn B.*, 2023 WL 8369209, at *10 n.9. That is, "[i]mplied consent arises from the parties and trial court understanding something to be at issue and actually litigating it." *In re Glenn B.*, 2023 WL 8369209, at *10 n.9 (citing *Branch Banking & Trust Co. v. Hill*, 582 S.W.3d 221, 236 (Tenn. Ct. App. 2019)).

While Mother did not plead a lack of willfulness in response to Father and Stepmother's abandonment by failure to visit ground in her answer, it appears that the parties tried the issue of willfulness by implied consent. During an opening statement, Mother's counsel explained that her contention was that "there was a pattern of the child being kept away . . . while . . . voluntarily trying to exercise parenting time" such that "there was not a willfulness on the abandonment issue." *See McLemore*, 968 S.W.2d at 803 (emphasizing party litigation choices at trial). Father and Stepmother presented evidence showing Mother's failure to visit was willful. On appeal, Mother reiterates a lack of willfulness-based argument. Significantly, the trial court understood willfulness to be at issue and made findings related to Mother's willfulness in its order terminating her parental rights. Assessed in the context of the full record on appeal, we conclude that the parties tried Mother's willfulness by implied consent. *Compare In re Glenn B.*, 2023 WL 8369209, at *10 & n.9 (finding no implied consent) *with In re Chance B.*, 2024 WL 764015, at *8 (analyzing lack of willfulness based on an implied consent determination).

Determining whether Mother's failure to visit was willful, the trial court concluded that Father and Stepmother proved that Mother's failure to visit was willful by clear and convincing evidence. When willfulness is at issue in a termination case in relation to abandonment, the evidentiary standard is proof by a preponderance of the evidence with the burden on the party seeking to avoid termination rather than proof by clear and convincing evidence with the burden upon the party seeking termination.[7] Accordingly,

---

[7] "The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure." Tenn. Code Ann. § 36-1-102(1)(I). It is the parent who "bear[s] the burden of proof that the failure to visit . . . was not willful. Such defense must be established by a preponderance of evidence." *Id.* The trial court also found that Mother failed to prove by clear and convincing evidence that her failure to visit was not willful. Because the trial court concluded that Father and Stepmother proved

- 14 -

while the trial court found that Father and Stepmother proved Mother's willfulness in relation to failure to visit by clear and convincing evidence, Father and Stepmother were not required to do so.

Accordingly, in reviewing the question of willfulness regarding Mother's failure to visit on appeal, we consider the matter of willfulness under the preponderance of the evidence standard, rather than under a clear and convincing standard. The trial court made a variety of specific factual findings that are relevant to the question of willfulness. The trial court concluded that Father, whom the trial court found credible, testified that "he had not thwarted or prevented" Mother from visiting Silvia during the relevant four-month time period, that Mother's "drug addiction was a major cause for her abandonment of" Silvia as well as of Mother "not petitioning the Juvenile Court to allow her visitation with" Silvia,[8] that Mother "stated she did not take any steps to try to regain custody or visitation through the Juvenile Court," that Mother "stated she was a danger to the minor child during the time she used illegal narcotics and was not fit to be a parent," and that Father "did put the restriction on [Mother] to be drug free in order to visit" Silvia "but did not prohibit her from visiting."

Mother ascribes blame for her failure to Father and Stepmother who she contends thwarted her efforts to visit Silvia. The Tennessee Supreme Court has held that "a parent who attempted to visit and maintain relations with his child, but was thwarted by the acts of others and circumstances beyond his control, did not willfully abandon his child." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 810 (Tenn. 2007) (citing *In re Swanson*, 2 S.W.3d 180, 189 (Tenn. 1999)); *see also In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *5 (Tenn. Ct. App. July 22, 2020) ("Thus, a parent's failure to visit is willful when it is 'the product of free will, rather than coercion.'" (quoting *In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005))). "A parent's failure to visit may be excused by the acts of another only if those acts actually prevent the parent from visiting the child or constitute a significant restraint or interference with the parent's attempt to visit the child." *In re Braelyn S.*, 2020 WL 4200088, at *5 (quoting *In re M.L.P.*, 281 S.W.3d 387, 392-93 (Tenn. 2009)); *In re Mattie L.*, 618 S.W.3d 335, 350-51 (Tenn. 2021) ("Failure to visit is not willful if it is the result of coercion").

Interference analysis "is not a mechanical process." *In re Braelyn S.*, 2020 WL 4200088, at *5. The court considers whether Father and Stepmother made "an effort . . . to interfere with Mother's right to see [Silvia] or to communicate with [Silvia]" under "the totality of the circumstances." *See In re Justin P.*, No. M2017-01544-COA-R3-PT, 2018

---

willfulness in Mother's failure to visit by clear and convincing evidence, this precludes a finding that Mother met her burden to show lack of willfulness by a preponderance of the evidence, rendering the trial court's reference to the burden of clear and convincing evidence for Mother harmless error.

[8] The trial court noted that Mother did not stop using illegal drugs until after the filing of the petition to terminate her parental rights.

WL 2261187, at *6 (Tenn. Ct. App. May 17, 2018) (determining interference carried out through a variety of means rendered Mother's lack of visitation not willful); *In re Sophia P.*, No. M2016-01400-COA-R3-PT, 2017 WL 1191299, at *8 (Tenn. Ct. App. Mar. 30, 2017) (concluding multiple actions of grandparents, even if "well-intentioned[,] . . . had the effect of significantly interfering" when "[c]onsidering all the circumstances" of the case). A variety of actions can constitute interference in the failure to visit context, including but not limited to blocking a biological parent from accessing their child, concealing a child's whereabouts from the biological parent, and "vigorously resisting" a biological parent's visitation efforts. *In re Braelyn S.*, 2020 WL 4200088, at *5 (quoting *In re S.M*, 149 S.W.3d 632, 642 n.18 (Tenn. Ct. App. 2004)). This court has also indicated that interference may exist when there exists such "enmity between the parties" that the parents "redirect their efforts at maintaining a parent-child relationship to the courts." *Id.* (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Because interference often occurs prior to the four-month period examined within the failure to visit ground, "courts often consider events that occurred prior to the relevant period [outlined by the termination statute] to determine if there was interference with the biological parent's attempts to visit." *In re Alex B.T.*, No. W2011-00511-COA-R3-PT, 2011 WL 5549757, at *6 (Tenn. Ct. App. Nov. 15, 2011) (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 801; *In re S.M.*, 149 S.W.3d 632 (Tenn. Ct. App. 2004)); *In re Braelyn S.*, 2020 WL 4200088, at *5.

This court has found that court-issued drug testing requirements with negative tests as a condition for visiting do not create a significant restraint on visitation within the meaning of our willfulness jurisprudence. *See In re Lauren F.*, No. W2020-01732-COA-R3-PT, 2021 WL 5234712, at *9 (Tenn. Ct. App. Nov. 10, 2021) ("This Court has previously held that a father's failure to visit was willful where he failed to produce a negative drug screen in order to be permitted to visit with the child."); *c.f. In re Nicholas K.*, No. M2023-00951-COA-R3-PT, 2024 WL 1069835, at *9 (Tenn. Ct. App. Mar. 12, 2024) ("We are similarly not persuaded that the trial court's sole requirement that Father submit and pass a drug screen prior to reinstating visitation 'amount[ed] to a significant restraint' on Father's ability to maintain a relationship with the children."). This court has also observed that "a custodial parent alleg[ation] that [he] feared for her child's health or safety if visitation with the non-custodial parent was permitted" can be an important consideration in evaluating the totality of the circumstances where there are interference claims in relation to the issue of willfulness. *In re Braelyn S.*, 2020 WL 4200088, at *8.

As noted above, willfulness is not a mechanical determination, and courts faced with determining whether a significant restraint has occurred make determinations based upon the fact-specific circumstances of the particular case. *In re Lucca M.*, No. M2021-01534-COA-R3-PT, 2023 WL 2703706, at * (Tenn. Ct. App. Mar. 30, 2023) (quoting *In re Braelyn S.*, 2020 WL 4200088, at *5). Here, there was no communication from Mother during the relevant four-month period in which she actually requested to visit Silvia. Mother also conceded that she continued to heavily abuse drugs during this period and that she posed a danger to the Child when she was abusing drugs. Additionally, Mother

conceded that Father was generally reasonable with her in relation to how he dealt with matters of visitation. In response to Father's earlier admonition, issued approximately two months before the start of the relevant statutory period, that she needed to not be on drugs when visiting with Silvia, Mother did not seek any form of judicial redress. Mother did not testify that any barriers existed that would prevent her from seeking judicial relief. There is absolutely no evidence that suggests that the limitation imposed by Father was not intended to protect the well-being of the Child, that his concerns regarding the Child's safety in connection with Mother's continuing drug abuse and visitation were misplaced, or Father would not have allowed Mother had she not been heavily abusing drugs at the time to visit the Child if Mother had made such a request.

The record is clear in the present case that Mother did not actually visit Silvia during the relevant four-month period. We agree that this is established by clear and convincing evidence. Reviewed under the applicable preponderance of the evidence standard, we cannot say under the circumstances of the present case that the trial court erred in concluding that Mother's failure to visit was willful.

## B. Abandonment by Failure to Support

The trial court also found that Father and Stepmother presented clear and convincing evidence that Mother abandoned Silvia by failing to support her. *See* Tenn. Code Ann. § 36-1-113(g)(1) (effective July 1, 2021, to Jun. 30, 2022). Failure to support occurs when a parent fails to support his or her child "[f]or a period of four (4) consecutive months immediately preceding" the filing of the termination petition. Tenn. Code Ann. § 36-1-102(1)(A)(i). Failure to support is defined as "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period." Tenn. Code Ann. § 36-1-102(1)(D). Support must be more than just token support, which is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B).

Mother acknowledged her failure to support Silvia financially during the following exchange with counsel:

[Counsel:] Okay. So as far as child support goes, you would agree, prior to this Cumberland Containers job, you did not work; is that correct?

[Mother:] Yes.

[Counsel:] And you did not work due to drug use?

- 17 -

[Mother:]  Yes.

[Counsel:]  But you could've worked?

[Mother:]  Yes.

[Counsel:]  And you understood that you were obligated, just as a parent, to support your child –

[Mother:]  Yes.

. . .

[Counsel:]  Have you ever financially supported Silvia?

[Mother:]  No.

[Counsel:]  Have you ever provided [Father] with any sort of support for Silvia?

[Mother:]  No.

As the above-quoted passage demonstrates, Mother's conduct during the relevant four-month period meets the statutory definition of abandonment by failure to support. Father and Stepmother similarly indicated that they had not received any support from Mother. Mother did not make a single payment to aid in Silvia's upbringing. *See* Tenn. Code Ann. § 36-1-102(1)(D).

We find no error in the trial court's conclusion that Father and Stepmother established Mother's failure to support Silvia by clear and convincing evidence.

C. Failure to Manifest an Ability and Willingness to Assume Custody

The trial court also concluded that Father and Stepmother proved that Mother failed to manifest an ability and willingness to assume custody of Silvia by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(g)(14) (effective July 1, 2021, to Jun. 30, 2022). To establish this ground for termination, Father and Stepmother were required to prove two separate statutory prongs by clear and convincing evidence. *See In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). First, Father and Stepmother needed to prove that Mother failed to manifest either an ability or willingness to personally assume legal and physical custody or financial responsibility of Silvia. *See id.*; Tenn. Code Ann. § 36-1-113(g)(14). The Tennessee Supreme Court has indicated the statute places a "conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally

- 18 -

assume legal and physical custody or financial responsibility for the child." *In re Neveah M.*, 614 S.W.3d at 677. Accordingly, the failure of the parent to manifest either ability or willingness will satisfy the first prong. *Id.*

"Ability focuses on the parent's lifestyle and circumstances," while willingness revolves around a parent's attempts "to overcome obstacles" preventing the parent from assuming custody. *In re Serenity W.*, No. E2018-00460-COA-R3-PT, 2019 WL 511387, at *6 (Tenn. Ct. App. Feb. 8, 2019). A parent's express desire to reunite with the child is insufficient to establish a willingness to assume custody. *See In re Nicholas C.*, No. E2019-00165-COA-R3-PT, 2019 WL 3074070, at *17 (Tenn. Ct. App. July 15, 2019). To the contrary, "[w]hen evaluating willingness, we look for more than mere words." *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018). This court instead considers a parent's efforts to surpass any obstacles standing in the way of assuming custody or financial responsibility. *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). A failure to make efforts to overcome such obstacles "can undercut a claim of willingness." *Id.*

If Father and Stepmother demonstrated that Mother lacked either an ability or willingness to assume custody, they would still be required to prove the second prong by clear and convincing evidence: that placing Silvia back in Mother's legal and physical custody would pose a risk of substantial harm to Silvia's physical or psychological welfare. *See* Tenn. Code Ann. § 36-1-113(g)(14); *In re Neveah M.*, 614 S.W.3d at 674. A substantial risk of harm requires "a real hazard or danger that is not minor, trivial, or insignificant" and requires the harm to be more than a "theoretical possibility" but to be "sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not." *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001); *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018).

Here, the trial court made findings as to the first but not the second prong of this ground for termination. The trial court indicated that it found "by clear and convincing evidence that [Mother] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility for the minor child." The trial court did not, however, make a factual finding that returning Silvia to Mother's care would pose a risk of substantial physical or psychological harm.

This court has indicated that a failure to include "specific findings of fact and conclusions of law" related to the second prong of the failure to manifest ground in a termination order requires reversal or vacating of this ground for termination. *See* Tenn. Code Ann. § 36-1-113(k); *see also In re Elijah F.*, No. M2022-00191-COA-R3-PT, 2022 WL 16859543, at *13 (Tenn. Ct. App. Nov. 10, 2022) ("Considering the case at bar did

- 19 -

not include specific findings of fact to support its legal conclusion that returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare, we are compelled to reverse the court's judgment with respect to this statutory ground."). "Notably, this Court has previously reversed a finding of the existence of this statutory ground when the trial court provided no findings of fact regarding why placing the subject children back in the parent's custody would pose a risk of substantial harm to their welfare." *In re Elijah F.*, 2022 WL 16859543, at *13 (collecting cases); *In re Ethan W.*, No. M2021-01116-COA-R3-PT, 2023 WL 415999, at *10 (Tenn. Ct. App. Jan. 26, 2023) (reversing where "the court failed to address the second prong of the failure to manifest ground"); *In re Analesia Q.*, No. E2021-00765-COA-R3-PT, 2022 WL 1468786, at *8-9 (Tenn. Ct. App. May 10, 2022) (vacating failure to manifest ground where trial court made "no mention of the second statutory element in the . . . order, and DCS [did] not address this omission on appeal"); *In re Adaline D.*, No. E2020-01597-COA-R3-PT, 2021 WL 5297683, at *10 (Tenn. Ct. App. Nov. 15, 2021) (reversing failure to manifest ground when the "trial court's order [was] devoid of any reference to the substantial harm element of the statute"). The trial court may be correct that this ground has been established, but, based upon the record before us given the findings made by the trial court, we cannot adequately review the trial court's determination as to the termination ground of failure to manifest an ability and willingness to assume custody. Because the trial court failed to address one of the two required statutory elements of the failure to manifest ground, we vacate the trial court's ruling with regard to this ground for termination. However, because we ultimately affirm the trial court's judgment upon other grounds, there is no purpose served by the trial court further addressing the issue on remand.

IV.

Having concluded that at least one statutory ground for termination of parental rights has been shown by clear and convincing evidence, this court's focus shifts to what is in Silvia's best interest. *See In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests." When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests

of the child . . . ."

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations omitted).

The nonexclusive factors relevant to the best interest analysis are laid out in Tennessee Code Annotated section 36-1-113(i)(1):

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

- 22 -

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1) (effective July 1, 2021, to June 30, 2022).

The trial court's findings as the best interest factors were as follows:

(a) In considering the effect of termination of parental rights will have on the child's critical need for stability and continuity of placement, the Court finds that other than a few month period of time, the Petitioner, [Father], has been the only person to provide stability and continuity for the minor child. Petitioner, [Stepmother], helped provide that stability and continuity once she entered the life of the minor child. The child is in a stable, caring, loving home and the termination will not affect the minor child. A change in placement would affect the minor child and would not be in her best interests.

(b) In considering the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition, the Court finds that this factor weighs in favor of the Petitioners. Petitioners have provided all of the care for the minor child, other than period of a few months. The Court finds that it would not be in the best interests of the minor child to place the child with [Mother.]

(c) In considering whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs, the Court finds that [Mother] has not been able to show any continuity or stability due to her drug addiction throughout the minor child's life. Petitioners have provided and met the minor child's basic material, educational, and housing needs.

(d) In considering whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment, the Court finds that [Mother] does not have a bond with the minor child due to the lack of visitation throughout the child's life. The Court finds that the minor child has a parental bond with the Petitioners. The Court finds that [Mother] has been sober for several months and could possibly have had a parental relationship with the child had she become sober prior to these proceedings. [Mother] admits that she

- 23 -

does not have a parental bond with the minor child and that her drug addiction has caused her to not have a parental bond with the minor child.

(e) In considering whether the parent has maintained regular visitation, the Court finds that [Mother] has not maintained regular visitation since March 2020 when the minor child was removed from her care by the Juvenile Court of Cumberland County. [Mother] has been restricted from visiting the minor child due to her drug addiction.

(f) In considering whether or not the child is fearful of living in the parent's home, the Court finds that there has been no evidence presented to show that the minor child would be fearful in the home of [Mother.]

(g) In considering whether the parent's home or others in the parent's home triggered or exacerbated the child's experience of trauma, the Court finds that there has been no evidence presented to show that the minor child has trauma or that [Mother]'s home would cause such trauma.

(h) In considering whether the child has created a healthy parental attachment with another person or persons in the absence of the parent, the Court finds the minor child has a parental attachment to the Petitioners as mother and father. Petitioners have provided all the care, so in the Court's opinion, they are the parents of the minor child.

(i) In considering whether the minor child has emotionally significant relationships with persons other than parents or caregivers, including biological or foster siblings, the Court finds that the minor child has developed a significant relationship with her stepbrother. The minor child and her step brother do have a sibling bond. [Stepmother] has developed a significant relationship with the minor child and the minor child sees [Stepmother] as her mother.

(j) In considering whether the parent has demonstrated such a lasting adjustment of circumstances, conduct and conditions to make it safe and beneficial for the child to be in the home of the parent, the Court finds that [Mother] has made a dramatic change in her life and her drug addiction history.

(k) In considering whether the parent has taken advantage of available programs and services and community resources to assist, the Court finds that [Mother] has taken advantage of a drug rehabilitation program and has made a dramatic improvement regarding her history of drug addiction.

- 24 -

(l) In considering whether the Department of Children's Services has made reasonable efforts to assist the parent, the Court finds this provision inapplicable in this cause.

(m) In considering whether the parent has demonstrated a sense of urgency in establishing paternity, seeking custody, or addressing the circumstances, the Court finds that [Mother] did not take any steps to regain custody of the minor child after the Order was entered in Juvenile Court suspending her visitation.

(n) In considering whether the parent or other persons residing in or frequenting the home have shown brutality, physical, sexual, emotional or psychological abuse or neglect, the Court finds that that there has been no evidence presented on this provision.

(o) In considering whether the parent has ever provided safe and stable care, the Court finds that, even when [Mother] was in the home of the minor child, she was using illegal narcotics and was a danger to the minor child. [Mother] was only in the minor child's life for a few months after the child was born.

(p) In considering whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive, the Court finds no proof in the record to establish [Mother] has demonstrated this understanding until becoming sober during the pendency of this proceeding.

([r]⁹) In considering whether the physical environment of the parent's home is healthy and safe for the child, the Court finds that [Mother] does have an adequate home at the time of trial. However, [Mother] has not maintained a healthy and safe home for the minor child until this proceeding began. The Court finds the current home of the minor child, with Petitioners, is healthy and safe and always has been.

([s]) In considering whether the parent has consistently provided more than token financial support, the Court finds that [Mother] has never financially supported the minor child.

---

⁹ The trial court did not include factual findings expressly associated with Tennessee Code Annotated section 36-1-113(i)(1)(Q) and mislabeled the three remaining factors (R), (S), and (T) of Tenn. Code Ann. section 36-1-113(i)(1) as (q), (r), and (s). We have relabeled the factors using brackets to associate the analysis with the proper associated statutory factor. There is significant overlap between statutory factors (P) and (R), as to which the trial court made express findings, and statutory factor (Q), as to which it did not. Based upon the record, statutory factor (Q) does not provide any basis for undermining the trial court's overall conclusion as to best interest analysis.

- 25 -

([t]) In considering whether the mental or emotional fitness of the parent would be detrimental, the Court finds that [Mother] admitted to having suicidal thoughts and psychotic episodes that required hospitalization which cause the court concern about her mental and emotional fitness to parent the minor child.

Ultimately, the trial court found "by clear and convincing evidence, it to be in the best interest of the minor child for all [Mother's] parental rights to be terminated."

We consider whether Father and Stepmother proved that termination was in Silvia's best interest by clear and convincing evidence as found by the trial court. As many of the factors touch on similar factual predicates and involve similar issues, we group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case. *In re Chayson D.*, 2023 WL 3451538, at *14.

We first consider Silvia's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect child well-being), (D) (concerning parent-child attachment), (E) (concerning visitation), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's fitness and its corresponding impacts).[10] Silvia is thriving in Father and Stepmother's care. Silvia has a strong bond with Father and Stepmother. Mother "does not have a bond with the minor child." Mother has not been with Silvia since the first year of her life; Mother has not visited Silvia since March 2020. Mother is, as she concedes, essentially a stranger to Silvia. Mother knows little about Silvia, and Silvia knows nothing of Mother. Silvia has developed a strong bond with Stepmother, and it is Stepmother who is the mother figure in her life. Father and Stepmother have provided continuity and stability in her life, and as the trial court concluded, and the record supports, Mother's inclusion would have a negative impact on the Silvia.

With regard to support and knowledge of Silvia's needs, the trial court also found that these factors support termination. Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing parent providing more than token support); (P) (addressing parent's understanding of the child's needs). We agree with the trial court's evaluation of factor (S). Mother admits that she has not made any support payments to Silvia even though she has worked for Cumberland Containers since November 2021. Regarding factor (P), the trial court stated

---

[10] In the trial court's explanation related to factor (T) (mislabeled factor (S)), it referred to Mother's "psychotic episodes that required hospitalization." Mother did in her testimony agree with the characterization of two incidents as "psychotic episodes." There is some indication from the evidence that Mother's statement may reflect more of a colloquial rather than clinical use of this terminology. The evidence is so limited and opaque, however, on this matter that we decline to place any weight upon it in our analysis of the Child's best interest.

that Mother has not "demonstrated an understanding of the basic, specific needs required for the child to thrive" because "no proof in the record . . . establish[es] [Mother] has demonstrated this understanding until becoming sober during the pendency of this proceeding." We agree that Mother's efforts to abstain from her prior opioid abuse are relevant to this inquiry and are commendable. However, Mother's sobriety is just one of many inputs that matter for factor (P). This factor turns on whether Mother understands Silvia's "basic and specific needs," and the testimony at trial reflects that Mother does not understand her needs. Mother was asked about Silvia's current circumstances, and she conceded that she and Silvia were essentially strangers.

We turn next to considerations of Silvia's physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(F) (involving the child's fear of the parent's home), (G) (involving whether the child's trauma is triggered by being in the parent's home), (N) (involving any abuse or neglect present in the parent's home), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the child's needs), (R) (involving the health and safety of the home). No testimony was elicited regarding any trauma Silvia might associate with any residence wherein she lived with Mother, let alone any trauma whatsoever. Father and Stepmother also provided no proof that Silvia has been subjected to any "brutality, physical, sexual, emotional or psychological abuse or neglect" perpetrated by anyone residing in Mother's home. Accordingly, grounds (F), (G), and (N) do not favor termination. We agree, however, with the trial court that factor (O) supports termination. It is true that Mother spent a year with Father and his family and that, during that year, she cared for Silvia. However, Father presented unrefuted testimony that Mother was still abusing opioids during this period, and the evidence also supported that Mother struggled with providing stable care for Silvia during this time. Moreover, it is undisputed that Mother has not provided any type of care to Silvia since leaving that shared living arrangement with Father's family. Next, factor (Q) went nominally unaddressed in the trial court's order while factor (R), which was mislabeled but turns on a similar factual predicate, weighed against Mother. However, based on our review of the record, we believe that both factors (Q) and (R) favor Mother. While the trial court does state in its order that Mother "has not maintained a healthy and safe home for the minor child until this proceeding began," the trial court's conclusion appears to credit Mother's testimony that her housing situation was, by the time of trial, a safe and stable one. Father and Stepmother did not provide any evidence showing that Mother's current living arrangement is an unsafe one that Silvia could not, in theory, enter safely. Mother's testimony that she has repaired her relationship with her family, obtained safe and stable housing through her sister, and maintained that housing through the date of trial would strike against any contrary conclusion. Insofar as the trial court weighed the positive environment provided by Father and Stepmother against Mother's environment instead of examining Mother's circumstances with regard to safety and stability, we believe the trial court erred. Accordingly, as noted above, factors (Q) and (R) support Mother.

Next, we consider Mother's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (L) (involving DCS's reasonable efforts), (M) (involving parent's sense of urgency in addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest). Concerning factor (L), we agree with the trial court that this factor is inapplicable given DCS's general absence in this case. According to the trial court, factors (C) and (M) favor termination. We agree that those factors do, indeed, favor termination. Mother has not provided for Silvia's needs since March 2020. Despite her drug abuse being a barrier to involvement in the life of Silvia, Mother did not change her behavior with regard to drug addiction for an extended period of time, and even moved out of the house in which Silvia was living rather than attempting drug rehabilitation again. For more than a year and half after being separated from Silvia, Mother continued to abuse drugs and did not exhibit any sense of urgency in tackling this barrier to being part of Silvia's life. The trial court found that factors (J) and (K) weigh against termination based on its finding that Mother "has made a dramatic change in her life and her drug addiction history." We agree with these conclusions. The trial court properly recognized that Mother has taken significant steps in the right direction in improving her life. It is true that Father and Stepmother introduced evidence that Mother failed a drug screen one year prior to the trial that led to the termination of her parental rights. However, Mother subsequently passed a later-administered drug screen, and there is no evidence suggesting continuing drug abuse by Mother. As the trial court acknowledged, Mother has repaired her relationship with her sister and father, obtained housing, held employment, and worked successfully to try to manage her opioid addiction in the years following the filing of the termination petition.

In considering the best interest of a child, Tennessee courts must not merely "tally[]" the statutory factors but analyze the weight and relevance under the facts and circumstances of the case. *In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017); *see also In re B.D.M.*, No. E2022-00557-COA-R3-PT, 2023 WL 3019005, at *15 (Tenn. Ct. App. Apr. 20, 2023). "[T]he facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case." *Id.* at 682. "This court has repeatedly indicated that '[o]ften, the lack of a meaningful relationship between a parent and child is the most important factor in determining a child's best interest.'" *In re Krisley W.*, No. E2022-00312-COA-R3-PT, 2023 WL 2249891, at *11 (Tenn. Ct. App. Feb. 28, 2023) (quoting *In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *12 (Tenn. Ct. App. Apr. 14, 2020)).[11]

---

[11] *See also, e.g., In re Temperance A.*, No. M2023-00641-COA-R3-PT, 2024 WL 2891918, at *21 (Tenn. Ct. App. June 10, 2024); *In re Charles B.*, No. W2020-01718-COA-R3-PT, 2021 WL 5292087, at *11 (Tenn. Ct. App. Nov. 15, 2021); *In re Lauren F.*, No. W2020-01732-COA-R3-PT, 2021 WL 5234712, at *14 (Tenn. Ct. App. Nov. 10, 2021); *In re Christopher L.*, No. M2020-01449-COA-R3-PT, 2021 WL 4145150, at *9 (Tenn. Ct. App. Sept. 13, 2021); *In re Miley D.*, No. M2020-01416-COA-R3-PT, 2021 WL 2948776, at *6 (Tenn. Ct. App. July 14, 2021); *In re Cortez P.*, No. E2020-00219-COA-R3-PT, 2020 WL

Mother has made an impressive transformation in her life, and we do not doubt that it may be in Mother's best interest to retain her parental rights. It is not, however, Mother's best interest but instead Silvia's best interest that must be considered. Silvia is thriving in a loving and supportive household and is closely bonded with both Father and Stepmother. Mother is a stranger to Silvia, and Silvia is largely unknown to Mother. Silvia does not have a bond with Mother, and it is instead Stepmother whom Silvia regards as her mother. Mother did not act with urgency in addressing her drug abuse problem, which created a barrier to her being part of Silvia's life including not visiting with Silvia. Mother also has failed to provide any support for Silvia including after she began working. We conclude that the trial court did not err in determining that clear and convincing evidence demonstrates that it is in Silvia's best interest to terminate Mother's parental rights.

Having concluded the trial court did not err in finding that clear and convincing evidence established a ground for termination of parental rights existed in the present case or in finding that termination was in the best interest of Silvia, the trial court did not err in terminating Mother's parental rights.

## V.

In considering the arguments advanced on appeal and for the reasons discussed above, we affirm the judgment of the trial court. The costs of the appeal are taxed to the appellant, Amber S., for which execution may issue if necessary. The case is remanded for further proceedings.

s/ Jeffrey Usman
JEFFREY USMAN, JUDGE

5874873, at *12 (Tenn. Ct. App. Oct. 2, 2020).